# ROSEBUD SIOUX TRIBE *v.* KNEIP, GOVERNOR OF SOUTH DAKOTA, ET AL.

No. 75–562.   Argued January 12, 1977—Decided April 4, 1977

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, and STEVENS, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN and STEWART, JJ., joined, *post,* p. 615.

*Marvin J. Sonosky* argued the cause and filed briefs for petitioner.

*William J. Janklow,* Attorney General of South Dakota, argued the cause for respondents.   With him on the brief were

*Tom D. Tobin* and *David L. Knudson,* Special Assistant Attorneys General, and *William F. Day, Jr.*

*H. Bartow Farr* argued the cause for the United States *pro hac vice* as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Bork, Assistant Attorney General Taft, Edmund B. Clark,* and *Neil T. Proto.*[*]

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

In June 1972, the Rosebud Sioux Tribe sued in the United States District Court for the District of South Dakota to obtain a ·declaratory judgment that the original boundaries of their reservation, as defined in the Act of March 2, 1889, 25 Stat. 888, had not been diminished by three subsequent Acts of Congress passed in 1904, 1907, and 1910 respectively.[1] The District Court, noting that "[f]rom the time these acts were passed, these [four] counties have been treated as outside the Rosebud Sioux Reservation by the settlers, their descendants, the State of South Dakota and the federal courts," 375 F. Supp. 1065, 1084, denied relief. It concluded that Congress had intended to diminish the Reservation so as to exclude the four counties in South Dakota affected by the 1904, the 1907, and the 1910 Acts. The United States Court of Appeals for the Eighth Circuit, in a careful and comprehensive opinion, affirmed the judgment of the District Court. 521 F. 2d 87. We granted certiorari, 425 U. S. 989, to review this determination in the light of our recent decisions in *DeCoteau* v. *District County Court,* 420 U. S. 425 (1975), and *Mattz* v. *Arnett,* 412 U. S. 481 (1973). Since we conclude that the three Acts

---

[*]Briefs of *amici curiae* urging reversal were filed by *Richard A. Baenen* and *R. Anthony Rogers* for the Arapahoe Tribe et al.; by *Arthur Lazarus, Jr.,* for the Association on American Indian Affairs, Inc., et al.; and by *Richard B. Collins* and *Robert S. Pelcyger* for the National Congress of American Indians et al.

[1] Act of Apr. 23, 1904, 33 Stat. 254; Act of Mar. 2, 1907, 34 Stat. 1230; Act of May 30, 1910, c. 260, 36 Stat. 448.

of Congress in question satisfy the requirement that "[a] congressional determination to terminate [an Indian reservation] must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history," *Mattz* v. *Arnett, supra,* at 505, we affirm the judgment of the Court of Appeals.

I

When established, the Rosebud Indian Reservation contained somewhat over 3.2 million acres, and covered all or a portion of what later became five counties in South Dakota: Gregory, Tripp, Lyman, Mellette, and Todd. The three Acts we are asked to construe successively disposed of all unallotted lands in Gregory County (1904 Act), in Tripp and Lyman Counties (1907 Act), and in Mellette County (1910 Act). Only Todd County remains unaffected by these post-1889 enactments. The contention of the Rosebud Sioux Tribe is that these Acts, while opening up the unallotted land outside of Todd County to non-Indian settlement, did not thereby change the Reservation boundaries, which continued to encompass these five counties.

In determining whether or not the 1889 Reservation boundaries were subsequently diminished by congressional enactments, we are guided by well-established legal principles. The underlying premise is that congressional intent will control. *DeCoteau* v. *District County Court, supra,* at 444, 449; *United States* v. *Celestine,* 215 U. S. 278, 285 (1909). In determining this intent, we are cautioned to follow "the general rule that '[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith.' " *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164, 174 (1973), quoting *Carpenter* v. *Shaw,* 280 U. S. 363, 367 (1930); see also *Mattz* v. *Arnett, supra,* at 505. The mere fact that a reservation has been opened to settlement does not necessarily mean that the opened area has lost its reservation

status. *Mattz* v. *Arnett, supra;* see also *Seymour* v. *Superintendent,* 368 U. S. 351 (1962). But the "general rule" does not command a determination that reservation status survives in the face of congressionally manifested intent to the contrary. *DeCoteau* v. *District County Court, supra.* In all cases, "the face of the Act," the "surrounding circumstances," and the "legislative history," are to be examined with an eye toward determining what congressional intent was. *Mattz* v. *Arnett, supra,* at 505.

Applying these principles to the facts of this case, we conclude 'that the Acts of 1904, 1907, and 1910 did clearly evidence congressional intent to diminish the boundaries of the Rosebud Sioux Reservation. The parties agree that an amendment to the 1889 Treaty, which provided for a fixed-sum payment and which was approved by three-fourths of the Rosebud Sioux Tribe's adult males in 1901, would have resulted in the diminution of the Rosebud Reservation boundaries. Congress did not, however, approve the 1901 amendment to the Treaty which the Tribe had ratified. The Tribe contends that, lacking tribal ratification and a fixed-sum provision, the later Acts were ineffectual to accomplish this same result. In the Tribe's view, the absence of these two factors vitally distinguishes the Acts in question from the otherwise similar Act examined in *DeCoteau* v. *District County Court, supra.* Because of the reasons hereafter set forth in greater detail, we conclude that, although the Acts of 1904, 1907, and 1910 were unilateral Acts of Congress without the consent of three-quarters of the members of the tribe required by the original Treaty,[2] that fact does not have any direct bearing on the question of whether Congress by these later Acts did intend to diminish the Reservation boundaries. By the time of

---

[2] The written consent of a majority of the Tribe was obtained prior to the 1904 and 1907 Acts, *infra,* at 593, 607; no written consent was obtained prior to the 1910 Act, but the " 'practically unanimous' " concurrence of the Indians was reported, *infra,* at 610.

the first of these Acts, in 1904, Congress was aware of the decision of this Court in *Lone Wolf* v. *Hitchcock,* 187 U. S. 553 (1903), which held that Congress possessed the authority to abrogate unilaterally the provisions of an Indian treaty. We also conclude that the changed method of payment is not conclusive with respect to congressional intent. Although the later Acts of Congress made less secure provisions for payment to the Tribe for the lands in question than did the 1901 Treaty, their language with respect to the reservation status of the opened lands was identical with or derivative from the language used in that proposed amendment.[3] The language was also substantially equivalent to that used in the executed agreement involved in *DeCoteau.* We agree with the Court of Appeals and the District Court that this language not only opened the land for settlement, but diminished the boundaries of the Reservation *pro tanto.*[4]

---

[3] The Tribe was eventually paid for all of the land opened to settlement in the three Acts, with the exception of some 4,600 acres, which were returned to the Tribe pursuant to an "Order of Restoration" dated January 12, 1938. See Indian Reorganization Act, 48 Stat. 984.

[4] The focus of our inquiry is congressional intent. This Court has pointed in its prior decisions to factors from which intent is inferred. The dissent erroneously seizes upon several factors and presents them as apparent absolutes, *post,* at 617–618. This, however, misapprehends the nature of our inquiry, which is to inquire whether a congressional determination to terminate is "expressed on the face of the Act or [is] clear from the surrounding circumstances and legislative history." *Mattz* v. *Arnett,* 412 U. S. 481, 505 (1973). *Mattz,* upon which the dissent relies, did not set forth absolutes. Rather, it first examined the history of the Reservation, *id.,* at 485–494, and then examined the enactment in light of this history and other surrounding circumstances. While in footnote 22 of *Mattz* we referred to examples of cases in which Congress had used "clear language of express termination" in particular situations, the notion that such express language in an Act is the *only* method by which congressional action may result in disestablishment is quite inconsistent with the just-quoted language from the text of *Mattz.* The dissent nonetheless relies on what it perceives to be an absence of any express disestablishment language

## II

The Rosebud Sioux are one of the tribes of Indians of the Sioux Nation. The Treaty of April 29, 1868, 15 Stat. 635, set aside all the land in South Dakota west of the Missouri River as the Great Sioux Reservation, consisting of some 25 million acres. Article 12 of the Treaty provided that no subsequent treaty for the cession of any part of the reservation would be valid without the written consent of three-fourths of the adult male Indians on the reservation. Despite this provision, in 1877 approximately 7.5 million acres, consisting of the Black Hills portion of the Great Sioux Reservation, were removed from the Reservation by the Act of February 28, 1877, 19 Stat. 254. See *Sioux Tribe of Indians* v. *United States*, 97 Ct. Cl. 613 (1942), cert. denied, 318 U. S. 789 (1943). Of the remaining Reservation, approximately one-half was "restored to the public domain" under the Act of March 2, 1889, 25 Stat. 896, § 21,[5] while six separate Reservations were carved out of the remainder, §§ 1–6. Section 2 set apart the Rosebud Reservation, encompassing what were later organized as three full counties (Todd, Mellette, and Tripp), a major portion of Gregory County, and a small portion of Lyman.[6] This Reservation, as originally delimited, contained over 3.2 million acres.

---

as that which is "perhaps most striking about the Rosebud Acts· . . . ." *Post*, at 618. Even then, however, the dissent concedes, as it must, that this "most striking" fact is not a fact at all with respect to the crucial 1904 Act: There Congress *used* cession language which *DeCoteau* v. *District County Court*, 420 U. S. 425, 445 (1975), found to be "precisely suited" to disestablishment.

[5] This termination of Reservation status was agreed to by three-fourths of the adult male Indians on the Great Sioux Reservation, S. Ex. Doc. 51, 51st Cong., 1st Sess., 234, 242 (1890).

[6] Under § 12, 25 Stat. 892,

"at any time after lands have been allotted to all the Indians of any tribe as herein provided, or sooner, if in the opinion of the President it shall be for the best interests of said tribe, it shall be lawful for the Secretary of

Around the turn of the century, the "familiar forces" to which we referred in *DeCoteau* v. *District County Court,* led to demands to open up the Reservation.[7] A provision in the Indian Department Appropriation Act, Mar. 3, 1901, 31 Stat. 1077, provided:

"[T]he Secretary of the Interior be, and he is hereby, authorized, in his discretion, to negotiate, through any United States Indian inspector, agreements with any Indians for the cession to the United States of portions of their respective reservations or surplus unallotted lands, any agreements thus negotiated to be subject to subsequent ratification by Congress."

Shortly thereafter Inspector James McLaughlin was instructed by the Commissioner of Indian Affairs to begin "negotiations with the Indians of the Rosebud reservation, in South Dakota, for the cession of the unallotted eastern portion of their reserve." Letter dated Mar. 19, 1901, from W. A. Jones, Commissioner, Office of Indian Affairs, Department of Interior. Following meetings with members of the Tribe during the spring and summer of 1901, Inspector Mc-Laughlin obtained the written consent of three-fourths of the

---

the Interior to negotiate with such Indian tribe for the purchase and release by said tribe, in conformity with the treaty or statute under which said reservation is held of such portions of its reservation not allotted as such tribe shall, from time to time, consent to sell, on such terms and conditions as shall be considered just and equitable between the United States and said tribe of Indians, which purchase shall not be complete until ratified by Congress . . . ."

This reproduced, *verbatim,* the language of the General Allotment Act, § 5, Act of Feb. 8, 1887, 24 Stat. 389.

[7] See H. R. Rep. No. 486, 56th Cong., 1st Sess., 1 (1900): "The people are anxious that this particular part of the reservation be opened and opportunity given for settlement and development of that region of the State. . . .

"The committee is informed the Indians are willing to treat for a cession of the lands in question."

male Indian adults to the cession of some 416,000 acres of unallotted land in Gregory County for the sum of $1,040,000, subject to congressional ratification.[8] The negotiated Agreement, however, was never ratified,[9] "because of the fact that it provided that the Government should pay for the lands outright . . . ." 38 Cong. Rec. 1423 (1904) (remarks of Rep. Burke).[10]

What is important for our purposes is the undisputed fact that the 1901 Agreement, had it been ratified by Congress, would have disestablished that portion of the Rosebud Reservation which lay in Gregory County. Inspector McLaughlin explained to the Tribe that "[t]he cession of Gregory County" by ratification of the Agreement "will leave your reservation a compact, and almost square tract, and would leave your

---

[8] Agreement, dated Sept. 14, 1901, between James McLaughlin, on the part of the United States, and the Sioux Tribe of Indians belonging on the Rosebud Reservation:

"ARTICLE I. The said Indians belonging on the Rosebud Reservation, South Dakota, for the consideration hereinafter named, do hereby cede, surrender, grant, and convey to the United States all their claim, right, title, and interest in and to all that part of the Rosebud Indian Reservation now remaining unallotted, situated within the boundaries of Gregory County, South Dakota . . . .

"ART. II. In consideration of the land ceded, relinquished, and conveyed by Article I of this agreement, the United States stipulates and agrees to expend for and pay to said Indians, in the manner hereinafter provided, the sum of one million and forty thousand (1,040,000) dollars." S. Doc. No. 31, 57th Cong., 1st Sess., 28 (1901).

[9] In 1902, a ratification bill passed the Senate and was reported favorably in the House. 35 Cong. Rec. 5024 (1902); H. R. Rep. No. 2099, 57th Cong., 1st Sess. (1902). The bill was never given any consideration on the floor of the House.

[10] See also S. Rep. No. 3271, 57th Cong., 2d Sess., 2 (1903); 36 Cong. Rec. 2748 (1903) (remarks of Sen. Gamble). Congressman Burke and Senator Gamble were the sponsors of the various bills concerning the Rosebud Reservation. As the Court of Appeals noted, and as all parties appear to agree: "The problem in the Congress was not jurisdiction, title, or boundaries. It was, simply put, money." 521 F. 2d 87, 94.

reservation about the size and area of Pine Ridge Reservation."[11]   It is conceded that his description was correct; the effect and intent of the 1901 Agreement, if ratified, would have been to change the Reservation boundaries.   As we noted in *DeCoteau* v. *District County Court,* 420 U. S., at 445, in construing virtually identical language: "The Agreement's language . . . was precisely suited to this purpose [of disestablishment]."   In this Agreement, therefore, we have—unlike the situation in *Mattz* v. *Arnett,* 412 U. S. 481 (1973)—an unmistakable baseline purpose of disestablishment.

An examination of the legislative processes which resulted in the 1904 Act convinces us, as it did the lower courts, that this purpose was carried forth and enacted.   Because of the history of the 1901 Agreement, the 1904 Act cannot, and should not, be read as if it were the first time Congress had addressed itself to the diminution of the Rosebud Reservation.

In 1903, new bills were introduced, and subsequently reported from committee in both chambers of Congress, which proposed "to adopt a new policy in acquiring lands from the Indians [by] provid[ing] that the lands shall be disposed of to settlers . . . , and to be paid for by the settlers, and the money to be paid to the Indians only as it is received . . . from the settlers."[12]   The Senate bill, S. 7390, passed the Senate in February, 36 Cong. Rec. 2748 (1903), but the 57th Congress expired before the House could give it consideration.   In line with the changes in S. 7390, which related to the method of payment, Inspector McLaughlin was subsequently instructed to go to the Rosebud Reservation to negotiate a new

---

[11] Proceedings of a Council with the Indians of Rosebud Reservation, Sept. 5, 1901, in S. Doc. No. 31, 57th Cong., 1st Sess., 12 (1901); see also Proceedings of a Council with the Indians of the Ponca Creek District, Rosebud Reservation, Apr. 13, 1901, in S. Doc. No. 31, *supra,* at 8–10.

[12] H. R. Rep. No. 3839, 57th Cong., 2d Sess., 1–2 (1903) (to accompany H. R. 17467); S. Rep. No. 3271, 57th Cong., 2d Sess., 2 (1903) (to accompany S. 7390).

agreement.[13]  He explained to the Rosebud Tribe: "I am here to enter into an agreement which is similar to that of two years ago, except as to the manner of payment . . . . You will still have as large a reservation as Pine Ridge after this is cut off." [14]

Inspector McLaughlin failed to get three-fourths of the adult male Indians to consent to this new method of payment, although he did obtain the consent of a majority, provided that the price to homesteaders be raised from $2.50 to $2.75 per acre.  Agreement of Aug. 10, 1903.[15]  How-

---

[13] Letter from the Commissioner of Indian Affairs to James McLaughlin, U. S. Indian Inspector, June 30, 1903, App. 461–462:

"In a joint request to the Department dated April 4, 1903, the members of the South Dakota delegation in Congress . . . asked that an Inspector be detailed to proceed to the Rosebud Indian reservation, in South Dakota, for the purpose of negotiating a new agreement with the Indians thereof for the cession of the unallotted portion of their reserve embraced in Gregory County, along the lines proposed in Senate Bill No. 7390 . . . .

"The essential features of said S. 7390, with which you are already familiar, are as follows:

"(1) That instead of paying the Indians the lump sum of $1,040,000 for the surplus Gregory County lands as provided in the agreement of September 14, 1901, the lands be disposed of to settlers under the provisions of the homestead and town-site laws, excepting sections 16 and 36 or the equivalent thereof, at not less than $2.50 per acre, the proceeds arising from such sale to be paid to the Indians."

In light of Lone Wolf v. Hitchcock, 187 U. S. 553 (1903), the House and Senate Committees understood that consent of the Indians to the change was not mandatory, but "in view of the [1868] treaty stipulation . . . it would be better to require the treaty as amended to be accepted by the Indians before it becomes effective." H. R. Rep. No. 3839, supra, at 2; S. Rep. No. 3271, supra, at 2.

[14] Minutes of Council held at Rosebud Agency, S. D., with the Sioux Indians belonging on the Rosebud Reservation 21–22 (July 30, 1903); see also id., at 37 (Aug. 8, 1903); id., at 50 (Aug. 10, 1903).

[15] The operative language of the new Agreement was identical to that contained in the 1901 Agreement:

"The said Indians belonging on the Rosebud Reservation, South Dakota, for the consideration hereinafter named, do hereby cede, surrender, grant,

ever, as Inspector McLaughlin had explained to the Tribe,[16] Congress understood that it was not bound by the three-fourths-consent requirement of the 1868 Treaty with the Sioux Nation. In *Lone Wolf* v. *Hitchcock,* 187 U. S., at 566, 568, this Court, dealing with the validity of a cession of tribal lands enacted in contravention of a treaty requiring three-fourths Indian consent, held:

> "The power exists to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should do so. When, therefore, treaties were entered into between the United States and a tribe of Indians it was never doubted that the *power* to abrogate existed in Congress . . . .

> "... In any event, as Congress possessed full power in the matter, the judiciary cannot question or inquire into the motives which prompted the enactment of this legislation."

Although Inspector McLaughlin failed to garner the signatures of three-quarters of the Indians in consent of the proposed changes, Congress understandably relied on this holding as authorizing it to diminish unilaterally the Reservation boundaries.

In examining congressional intent, there is no indication

---

and convey to the United States all their claim, right, title, and interest in and to all that part of the Rosebud Indian Reservation now remaining unallotted, situated within the boundaries of Gregory County . . . ."

[16] Minutes of Council held at Rosebud Agency, S. D., with the Sioux Indians belonging on the Rosebud Reservation 21–22 (July 30, 1903); see also *id.,* at 37 (Aug. 8, 1903); *id.,* at 50 (Aug. 10, 1903).

that Congress intended to change anything other than the form of, and responsibility for, payment. In recommending ratification of the 1901 Agreement, as modified, the accompanying House Report stated:

"The purpose of this bill is to ratify and amend an agreement made with the Rosebud Indians in South Dakota by Inspector James McLaughlin, dated September 14, 1901, providing for the cession to the United States of the unallotted portion of their lands in Gregory County, S. Dak., and opening the same to settlement and entry under the homestead and town-site laws.

.         .         .         .         .

"There is no question but what the Indians have no use for the land that is proposed to be ceded by this bill; that the tract is only a very small portion of the Rosebud Reservation, and is really only a corner of the reservation, which will be left compact and in a square tract and a reservation about equal in size to the Pine Ridge Reservation, in South Dakota." [17]

On the floor of the House, Congressman Burke, the 1904 Act's sponsor, in discussing the changes in the Agreement since

---

[17] H. R. Rep. No. 443, 58th Cong., 2d Sess., 1, 3 (1904) (accompanying H. R. 10418). The Report, *id.*, at 4, in discussing *Lone Wolf* v. *Hitchcock*, *supra*, considered whether ratification of the amended Agreement, which had not received the approval of three-fourths of the adult male Indians, was appropriate, and concluded that it was:

"It appearing, therefore, that more than three-fourths of the male adult Indians signed the original treaty, that more than a majority were willing to sell at a less [*sic*] price than provided in this bill, and the fact that the Department recommends the passage of the measure, provided the Indians can be insured of a lump sum equal to $1,040,000, the amount mentioned in the original treaty, and the committee having fixed a price that it is believed will more than insure this amount it is thought wise and no hardship or even injustice to the Indians to have such a measure passed, and for that reason recommend the passage of the bill."

596

1901, made clear that the new bill was concerned only with the responsibility for payment, 38 Cong. Rec. 1423 (1904):

"Mr. BURKE. . . . In 1901 a treaty was entered into with the Rosebud Indians on the part of the United States, by which the Indians agreed to sell to the Government this land for $2.50 per acre. That treaty was transmitted to Congress, and because of the fact that it provided that the Government should pay for the lands outright and then take the chance of the Treasury being reimbursed by disposing of the lands to settlers, it never got further than through the Committee on Indian Affairs, which unanimously reported it favorably. It was never given consideration in the House.

"Toward the concluding days of the last session of Congress a new bill was prepared, substantially as this bill now provides, and that bill provided that the lands should be ceded by the Indians to the Government, disposed of to settlers under the provisions of the homestead law, the price to be fixed at $2.50 an acre, as was provided in the original treaty. . . . This bill is substantially the same as the bill which I have just referred to . . . ."

The bill itself, as introduced and passed by both Houses, incorporated the entire text of the 1903 Agreement, which itself followed the 1901 Agreement except that: (1) the Indians were not guaranteed any consideration for the land except with respect to the 16th and 36th sections (school sections), but were to be paid only as the lands were actually sold to settlers; (2) the United States did not guarantee to find purchasers but agreed only to "act as trustee for said Indians to dispose of said lands." [18] In particular, the 1904

---

[18] Despite this "uncertain sum" proviso, § 2 of the Act, 33 Stat. 258, suggests that Congress viewed this land as disestablished immediately:

"That all lands herein ceded and opened to settlement under this Act, remaining undisposed of at the expiration of four years from the taking

Act incorporated verbatim the language of immediate cession of the 1901 Agreement:

> "The said Indians belonging on the Rosebud Reservation, South Dakota, for the consideration hereinafter named, do hereby cede, surrender, grant, and convey to the United States all their claim, right, title, and interest in and to all that part of the Rosebud Indian Reservation now remaining unallotted, situated within the boundaries of Gregory County . . . ." 33 Stat. 256.

As in *DeCoteau* v. *District County Court,* 420 U. S., at 445, this language is "precisely suited" to disestablishment.

Petitioner, however, objects that a "cession" requires bilateral consent, and the failure of Inspector McLaughlin to gain the approval of three-quarters of the male adult Indians vitiates any "cession." As a matter of strict English usage, petitioner is undoubtedly correct: "cession" refers to a voluntary surrender of territory or jurisdiction, rather than a withdrawal of such jurisdiction by the authority of a superior sovereign. But as Mr. Justice (then Judge) Holmes commented, we are not free to say to Congress: "We see what you are driving at, but you have not said it, and therefore we shall go on as before." *Johnson* v. *United States,* 163 F. 30, 32 (CA1 1908). Congress was simply repeating *verbatim* language from a bill ratifying the 1901 Agreement, which had made the proper use of the word "cession" because the Agreement had been approved by the Tribe. The use of the word "cession" in the 1904 Act, which was not consented to by the required extraordinary majority of the Tribe, does not make the meaning of the Act ambiguous as between diminution of the Reservation boundaries on the one hand, and merely opening up designated lands for settlement by non-Indians, on the other. The word is technically misused, but the meaning is quite clear. It was

---

effect of this Act, shall be sold and disposed of for cash, under rules and regulations to be prescribed by the Secretary of the Interior, not more than six hundred and forty acres to any one purchaser."

intended to accomplish, in 1904, precisely what it was intended to accomplish in 1901. Congress was under no misapprehension that the required portion of the Tribe had in fact approved the treaty. It knew that while a majority of the Tribe had approved it, the required extraordinary majority had not; but it had determined nonetheless to go ahead and accomplish the same result unilaterally as the Agreement would have accomplished bilaterally.[19]

The "bill provided that the lands should be ceded by the Indians to the Government . . . ." 38 Cong. Rec. 1423 (1904) (remarks of Rep. Burke). It is clear that Congress was relying on *Lone Wolf* v. *Hitchcock,* 187 U. S. 553 (1903), in making this unilateral declaration. There is nothing in the changed method of payment, or the failure to obtain a three-quarters vote from the Indians, which indicates that the clear intent of the 1901 Agreement to diminish the Reservation boundaries had changed between 1901 and 1904.[20] The Tribe, moreover, was eventually paid for the land, *supra,* at 588 n. 3.

---

[19] Congress was explicitly aware that it was acting pursuant to the holding in *Lone Wolf* v. *Hitchcock,* 187 U. S. 553 (1903). See H. R. Rep. No. 443, *supra,* n. 17, at 3–4; 38 Cong. Rec. 2829 2832 (1904) (remarks of Rep. Burke).

[20] We noted in *DeCoteau* v. *District County Court,* 420 U. S. 425 (1975), the fact that Congress had there ratified a sale for a sum certain. These two facts—Indian consent and a sum-certain payment—aided us in determining that congressional intent was to terminate the Reservation. But, as the Court of Appeals in the instant case recognized, "[t]he determination of disestablishment . . . rests upon congressional intent, as to which the method of payment, whether lump-sum or otherwise, is but one of many factors to be considered." 521 F. 2d, at 102. *DeCoteau* rested upon precisely such a determination, and neither the sum certain nor the consent was considered dispositive one way or the other. The statutory language discussed in *DeCoteau* is similar to the language of the 1904 Act. While the 1904 Act, to be sure, lacks a sum-certain payment as well as approval by three-fourths of the adult male Indians, it, in common with *DeCoteau,* starts from the form of an agreement, which was fully explained to the Rosebud Tribe both in 1901 and in 1904. The congressional recognition

This implied continuity in purpose from 1901 to 1904 does not, however, stand alone in indicating congressional intent. Section 4 of the 1904 Act, 33 Stat. 258, provides, in pertinent part:

> "[S]ections sixteen and thirty-six of the lands hereby acquired in each township shall not be subject to entry, but shall be reserved for the use of the common schools and paid for by the United States at two dollars and fifty cents per acre, and the same are hereby granted to the State of South Dakota for such purpose . . . ."

When North and South Dakota were admitted into the Union, § 10 of the admitting Act, Act of Feb. 22, 1889, 25 Stat. 679, provided, in pertinent part:

> "[U]pon the admission of each of said States into the Union sections numbered sixteen and thirty-six in every township of said proposed States . . . are hereby granted to said States for the support of common schools . . . : *Provided,* That the sixteenth and thirty-sixth sections embraced in permanent reservations for national pur-

"that the Agreement could not be altered," 420 U. S., at 438, was not present in this case for the simple reason that between the Sisseton-Wahpeton Agreement and the 1904 Rosebud Act, *Lone Wolf* v. *Hitchcock, supra,* had been decided. Nor is there any "clear retreat from previous congressional attempts to vacate the . . . Reservation in express terms," *DeCoteau* v. *District County Court, supra,* at 448, as there was in *Mattz* v. *Arnett.* Finally, as is discussed, *infra,* at 603–605, as in *DeCoteau,* the State has exercised unquestioned jurisdiction over the disputed area since the passage of the enactment—an indication of the intended purpose of the Act that was not present in *Mattz* v. *Arnett,* 412 U. S., at 505. Moreover, other factors, not present in *DeCoteau,* press for a finding of disestablishment. Here, for example, unlike the situation in *DeCoteau,* we are not faced with an Act which, if it disestablished the area under question, would terminate the entire reservation, 420 U. S., at 446–447. Considered together, we feel that those disestablishment factors present in *DeCoteau* but not present here are counterbalanced by the disestablishment factors present both here and in *DeCoteau* as well as those factors present here, but not in *DeCoteau.*

poses shall not, at any time, be subject to the grants . . . of this act, nor shall any land embraced in Indian, military, or other reservations of any character be subject to the grants . . . of this act until the reservation shall have been extinguished and such lands be restored to, and become a part of, the public domain."

The language of § 10 is mandatory: "nor shall" the 16th and 36th sections of lands within Indian reservations "be subject to the grants . . . until the reservation shall have been extinguished . . . ." While Congress would have had the power to establish other grants, cf. 43 U. S. C. § 856, the legislative history, in this case, demonstrates that Congress "included the provision to implement the grant in the enabling act and for no other reason." 521 F. 2d, at 101.[21] Both the House and Senate Reports explicitly noted that the "school sections" provision of what became the 1904 Act "is in conformity with the guarantee given to the State of South Dakota by Congress in the enabling act . . . ."[22] Congress, therefore, clearly thought that it was acting pursuant to § 10 of the Act of February 22, 1889, and not *sub silentio* adding an additional grant for

---

[21] See, *e. g.*, 35 Cong. Rec. 3187 (1902) (remarks of Sen. Gamble):

"Under the provisions of the enabling act authorizing the admission of the State of South Dakota into the Union, sections 16 and 36 in every township were reserved for school purposes. This provision did not apply to permanent Indian reservations, but became operative when the Indian title was extinguished and the lands restored to and became a part of the public domain."

38 Cong. Rec. 1423 (1904):

"Mr. FINLEY. Then as I understand the gentleman, he bases the wisdom or equity for this provision upon the enabling act admitting South Dakota into the Union. Mr. BURKE. Yes. Mr. FINLEY. And not otherwise? Mr. BURKE. No."

[22] H. R. Rep. No. 3839, 57th Cong., 2d Sess., 2 (1903); S. Rep. No. 3271, 57th Cong., 2d Sess., 2 (1903); H. R. Rep. No. 443, 58th Cong., 2d Sess., 2 (1904); S. Rep. No. 651, 58th Cong., 2d Sess., 2 (1904). See also n. 40, *infra.*

school lands located within a continuing reservation.[23] The far more natural construction, then, is to read a congressional intent to disestablish Gregory County from the Rosebud Reservation, thereby making the sections available for disposition to the State of South Dakota for "school sections" under § 10 of the Act of February 22, 1889.[24]

[23] Moreover, as discussed in n. 24, *infra*, under *Minnesota* v. *Hitchcock*, 185 U. S. 373 (1902), it was a possibility that the lands in Gregory County, although disestablished from the Reservation by the 1904 Act, were not thereby converted into "public lands." Section 10 of the Act of February 22, 1889 would not, in that case, apply to the lands even though disestablished from the Reservation.

[24] Petitioner urges that the "school sections" provision indicated that Congress was not disestablishing the county, since, upon disestablishment, the sections would have automatically passed to South Dakota under § 10 of the Act of February 22, 1889. We disagree. Section 4 of the 1904 Act not only provides for the grants of the sections to the State, but also for the method and amount of payment. The section, therefore, is not superfluous. See also n. 23, *supra*.

The United States, as *amicus curiae*, argues that *Minnesota* v. *Hitchcock*, *supra*, supports the position of petitioner. *Hitchcock*, however, does not deal with the question of whether the utilization of an explicit "school sections" clause demonstrates that Congress must have intended the Reservation boundaries to have continued undiminished. Rather, the issue in *Hitchcock* was quite different: It dealt with whether *ceded* lands automatically became subject to an earlier Act's "school sections" provision. The Court concluded that "none of these ceded lands passed under the school grant to the State" because, due to a trust imposed upon them, they had a preceding status that precluded their becoming "public lands." 185 U. S., at 395, 401–402. This preceding status could exist even if the lands were disestablished from a reservation. *United States* v. *Pelican*, 232 U. S. 442, 449 (1914); cf. *Ash Sheep Co.* v. *United States*, 252 U. S. 159, 166 (1920). As recognized by the Court of Appeals, "the fact that a beneficial interest is retained does not erode the scope and effect of the cession made, or preserve to the reservation its original size, shape, and boundaries." 521 F. 2d, at 102. The question of whether lands become "public lands" under *Hitchcock* and *Ash Sheep*, is therefore, logically separate from a question of disestablishment. *United States* v. *Pelican*, *supra*. As the issue is not before us, we need not decide whether or not the lands became "public lands."

That it was clearly understood, at least by the Executive Branch, that the 1904 Act, like the 1901 Agreement, contemplated a diminution of the Reservation, is apparent from the Rosebud Proclamation of May 13, 1904, 33 Stat. 2354. In accordance with the requirement of § 2 of the 1904 Act that the land would "be disposed of under the general provisions of the homestead and town-site laws of the United States, and shall be opened to settlement and entry," the Proclamation stated, in pertinent part:

> "Whereas by an agreement between the Sioux tribe of Indians on the Rosebud Reservation, in the State of South Dakota, on the one part, and James McLaughlin, a United States Indian Inspector, on the other part, amended and ratified by act of Congress . . . *the said Indian tribe ceded, conveyed, transferred, relinquished, and surrendered, forever and absolutely, without any reservation whatsoever,* expressed or implied, unto the United States of America, *all their claim, title, and interest of every kind and character* in and to the unallotted lands embraced in the following described tract of country now in the State of South Dakota, . . .

> .     .     .     .     .

> "NOW, THEREFORE, I, THEODORE ROOSEVELT, President of the United States of America, by virtue of the power vested in me by law, do hereby declare and make known that all of the lands so as aforesaid ceded by the Sioux tribe of Indians of the Rosebud Reservation . . . will, on the eighth day of August, 1904, at 9 o'clock a. m., in the manner herein prescribed and not otherwise, *be opened to entry and settlement and to disposition under the general provisions of the homestead and townsite laws of the United States.*" (Emphasis supplied.)

The opening portion of the Proclamation is an unambiguous, contemporaneous, statement, by the Nation's Chief Executive,

of a perceived disestablishment of Gregory County. It reflects, we believe, the clear import of the congressional action in the 1904 Act.

In sum, an examination of the process leading up to the enactment of the 1904 Act, as well as the language and legislative history, leads us, as it led the Court of Appeals and the District Court, to the firm conclusion that congressional intent was to exclude Gregory County from the Rosebud Reservation.[25]

Although the subsequent "jurisdictional history," *DeCoteau* v. *District County Court,* 420 U. S., at 442, is not entirely clear, the single most salient fact is the unquestioned actual assumption of state jurisdiction over the unallotted lands in Gregory County since the passage of the 1904 Act, see 375 F. Supp., at 1084; Amended Complaint ¶ 21.[26] Since state

---

[25] As noted by the Court of Appeals, 521 F. 2d, at 102 n. 54:

"Congressional action with reference to Gregory County shortly after the passage of the 1904 Act also confirms the conclusions. By the Act of February 7, 1905, ch. 545, 33 Stat. 700, Congress granted settlers an extension of time in which to establish their residence upon the opened Gregory County lands. The title and the body of the Act contain the following language:

'lands which were *heretofore* a part of the Rosebud Indian Reservation within the limits of Gregory County, South Dakota.'

"33 Stat. 700 (Emphasis added). See S. Rep. No. 2760, 58th Cong., 3d Sess., 1 (1905); H. R. Rep. No. 4198, 58th Cong., 3d Sess., 1 (1905); 39 Cong. Rec. 1578 (1905) (remarks of Sen. Gamble)."

The 1905 Act, passed a short time after the 1904 Act by the same Congress, and dealing with the same subject matter, is additional evidence of the congressional intent to disestablish Gregory County from the Rosebud Reservation in the 1904 Act. There are, moreover, references in the legislative history of the 1907 and 1910 Acts, discussed, *infra,* at 608, 609, and nn. 38, 39, and at 611, 612, which reinforce the conclusion that Congress, in 1904, disestablished Gregory County.

[26] See also *State* v. *White Horse,* — S. D. —, 231 N. W. 2d 847 (1975). This factor, of course, applies with equal force to the counties affected by the 1907 Act and by the 1910 Act, *infra,* at 605–615.

jurisdiction over the area within a reservation's boundaries is quite limited, 18 U. S. C. § 1151; *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164 (1973); *Williams* v. *Lee,* 358 U. S. 217 (1959); *Worcester* v. *Georgia,* 6 Pet. 515 (1832), the fact that neither Congress nor the Department of Indian Affairs has sought to exercise its authority over this area, or to challenge the State's exercise of authority is a factor entitled to weight as a part of the "jurisdictional history." [27] The long-

---

[27] As already noted, the District Court found that "[f]rom the time these acts were passed, these [four] counties have been treated as outside the Rosebud Sioux Reservation by the settlers, their descendants, the State of South Dakota and the federal courts." 375 F. Supp., at 1084. This factual finding is unchallenged. Both parties rely on other post-Act indicia of jurisdictional assumption, but they are, at best, confusing and unenlightening. The Indian Reorganization Act of 1934, 48 Stat. 984, and the Department of Interior's reaction thereto, urged perhaps most fervently by the United States as *amicus curiae,* fail to establish with anything like clarity the view of Congress, or the Department of the Interior, in the 1930's, with respect to land affected by such Acts as the 1904 Act involved herein. Under § 3 of the Indian Reorganization Act, the Secretary of the Interior was authorized "to restore to tribal ownership the remaining surplus lands of any Indian reservation heretofore opened . . . ." 48 Stat. 984. Under § 8, however, it was stated that "[n]othing contained in this Act shall be construed to relate to Indian holdings of allotments or homesteads upon the public domain outside of the geographic boundaries of any Indian reservation now existing . . . ." 48 Stat. 986. Section 8, relied heavily upon by the United States in its *amicus* brief, on its face refers to nothing more than *"Indian* holdings of allotments or homesteads" outside the boundaries of a reservation. This comports with the definition of "Indian country" in 18 U. S. C. § 1151. In any case, no clear view on the part of the relevant agencies that land opened up under uncertain-sum agreements remained reservation land exists. Compare Interior Department Opinion, 54 I. D. 559, 560 (1934), with Opinion of Acting Solicitor, 56 I. D. 330, 333 (1938). As was observed, n. 24, *supra,* the question of whether lands became public lands is separate from the question of intent to disestablish boundaries. The relevant materials presented with respect to the Indian Reorganization Act of 1934 simply do not present any clear treatment of the scope of the Rosebud Reservation, and hence are of minimal utility in our examination. Nor do we have a history of "repeated

standing assumption of jurisdiction by the State over an area that is over 90% non-Indian, both in population and in land use, not only demonstrates the parties' understanding of the meaning of the Act, but has created justifiable expectations which should not be upset by so strained a reading of the Acts of Congress as petitioner urges.[28]  We are simply unable to conclude that the intent of the 1904 Act was other than to disestablish.

## III

Having determined that the 1904 Act carried forth the intent to disestablish which was unquestionably manifested in the 1901 Agreement, our examination of the 1907 and the

recognition of the reservation status of the land after [the 1904 Act] by the Department of the Interior and by Congress." *Mattz v. Arnett,* 412 U. S., at 505.  The material presented by the parties reveals no consistent, or even dominant, approach to the territory in question.  In light of the clear assumption of jurisdiction over the past 70 years by the State of South Dakota of the territory now in dispute, and acquiescence by the Tribe and Federal Government, this sporadic, and often contradictory, history of congressional and administrative actions in other respects carries but little force.

[28] Cf. *Massachusetts v. New York,* 271 U. S. 65, 87, 94 (1926); *Martin v. Waddell,* 16 Pet. 367, 411–412, 414, 418 (1842).  A showing of long-standing assumption of jurisdiction is, in the related area of state boundary disputes, entitled to considerable weight.  See *Rhode Island* v. *Massachusetts,* 4 How. 591, 636 (1846); *Louisiana v. Mississippi,* 202 U. S. 1, 53–54 (1906); *Michigan* v. *Wisconsin,* 270 U. S. 295, 308 (1926); *Massachusetts v. New York, supra,* at 95; *Arkansas v. Tennessee,* 310 U. S. 563, 569 (1940).  In *United States v. Stone,* 2 Wall. 525, 537 (1865), involving a boundary between the Delaware Indian Reservation and land set aside for a United States Government military post, this Court stated: "In the case of private persons, a boundary surveyed by the parties and acquiesced in for more than thirty years, could not be made the subject of dispute by reference to courses and distances called for in the patents under which the parties claimed, or on some newly discovered construction of their title deeds.  We see no reason why the same principle should not apply in the present case . . . ."

1910 Acts is made easier. None of the parties really disputes that the intent of the three Acts was the same.[29] Because the later Acts do vary in some respects, however, we shall explain briefly why we find a continuity of intent through the 1907 and the 1910 Acts.[30]

The "familiar forces" at work pressing for the opening of Indian lands did not cease with the cession of Gregory County. By late 1906, Congressman Burke was preparing a bill dealing with the "sale of that part of the reservation located in Tripp County."[31] Inspector McLaughlin was instructed to proceed to the Rosebud Reservation to negotiate an agreement for land in Tripp County which when "ceded should be disposed of under the general provisions of the homestead and townsite laws of the United States," and he was given suggested terms, "similar to those in the disposal

---

[29] While, of course, urging that there was no congressional intent to disestablish, petitioner asserts that "[t]he substance of all three statutes is the same, as is much of the language." Brief for Petitioner 40. And again, id., at 41:

"The 1904 Act differs in format from the 1907 and 1910 Acts but not in substance. . . . As a result of these and other substantive changes [between the 1901 Agreement and the 1904 Act], the 1904 Act, in legal effect, as well as language, is the same as the 1907 and 1910 Acts. In all three statutes, the land was opened for sale to settlers with the proceeds credited to the Indians only as received."

[30] The dissenters feel that the 1907 and 1910 Acts "are far simpler for present purposes" since "[t]hey contain neither words of cession nor words of termination." Post, at 620. But the dissenters also recognize, as did the parties, that the 1904 Act is "properly regard[ed] as the crucial Act . . . ." Post, at 626. The 1907 and the 1910 Acts must be considered in context, and an important part of that context is the 1901 Agreement and the 1904 Act.

[31] Reference to letter of Nov. 22, 1906, from Rep. Burke to the Department of the Interior, Office of Indian Affairs, in letter of Dec. 5, 1906, from Commissioner F. E. Leupp, to Inspector James McLaughlin. Bills were introduced in December 1906, 41 Cong. Rec. 15 (1906) (Burke bill, H. R. 20547); id., at 50–51 (Gamble bill, S. 6618).

of the ceded lands in Gregory County . . . ." [32] Inspector Mc-
Laughlin's negotiations produced virtually the same result as
in 1904. A 1907 Agreement, signed by a majority, but not
by three-fourths, of the adult male Indians, provided that the
Indians "do hereby cede, grant, and relinquish to the United
States all claim, right, title, and interest in and to all that
part of the Rosebud Indian Reservation [in Tripp and Ly-
man Counties], except such portions thereof as have been, or
may hereafter be, allotted to Indians." [33] The Secretary of
the Interior recommended that Congress ratify the Agree-
ment, Letter from E. A. Hitchcock, *supra*, n. 33, and the Senate
Committee on Indian Affairs reported a ratification bill out,
S. Rep. No. 6831, 59th Cong., 2d Sess. (1907). By this time,
however, the House had already passed a second bill intro-
duced by Congressman Burke which did not incorporate the
Agreement, 41 Cong. Rec. 3103–3105 (1907) (H. R. 24987),
although it did substantially incorporate the terms of the
Agreement, as noted by Congressman Burke, *id.*, at 3104:

> "The bill is substantially in accordance with an agree-
> ment which has just been made with the Indians, signed
> by [a majority]. . . . It is along the line of the bill
> which passed in the Fifty-eighth Congress for the sale of
> that portion of this same reservation that is located in
> Gregory County.

---

[32] Letter of Dec. 5, 1906, from Commissioner F. E. Leupp, *supra*.
Inspector McLaughlin was told that it was "but right to the Indians also
that you should explain to them" that *Lone Wolf* v. *Hitchcock*, 187 U. S.
553 (1903), "vests in Congress the right to open their lands without their
consent; that the desire of the Department in sending you to talk the
matter over with the Indians is to obtain from them their views of the
terms on which the opening ought to be made . . . ."

[33] Letter from E. A. Hitchcock, Secretary of the Interior, to the Chair-
man, Committee on Indian Affairs, House of Representatives, Feb. 14,
1907 (enclosing Agreement), in H. R. Rep. No. 7613, 59th Cong., 2d Sess.,
4 (1907).

". . . They will have left, after this land is disposed of, a reservation that is substantially 50 miles square . . . ." [34]

The operative language of the bill, subsequently passed by the Senate without debate, and enacted into law, 34 Stat. 1230, provided:

"[T]he Secretary of the Interior be, and he is hereby, authorized and directed, as hereinafter provided, to sell or dispose of all that portion of the Rosebud Indian Reservation in South Dakota [in Tripp and Lyman Counties], except such portions thereof as have been, or may hereafter be, allotted to Indians . . . ."

As the parties recognize, the substance of the 1907 Act is identical to the 1904 Act. Section 2 provides for the disposition of lands under the "general provisions of the homestead and town-site laws," while § 3 specifies land purchase prices, with the proviso that "any lands remaining unsold after the said lands have been opened to entry for seven years may be sold to the highest bidder for cash, without regard to the above minimum limit of price." [35] Section 6 provides for the purchase by the United States of sections 16 and 36 of the lands in each township and their transfer to South Dakota for "the use of the common schools." [36] Sections 5 and 7 provide that the United States is to act as trustee for the Indians to dispose of the lands and to collect and dispense the proceeds.[37]

In virtually all respects, then, except for the operative language in § 1 replacing the Agreement language, the 1907

---

[34] In response to a question which inquired whether "the provisions of the treaty [have] been inserted in this bill," Congressman Burke replied: "I may say to the gentleman that they have been." 41 Cong. Rec. 3104 (1907).

[35] See the discussion, n. 18, *supra*, of the 1904 Act's comparable provision.

[36] The discussion, *supra*, at 599–601, with respect to the "school sections" provision of the 1904 Act, applies equally here.

[37] This, too, is substantively identical to the 1904 Act, *supra*, at 596.

Act is a functional twin of the 1904 Act. And, as the legislative comments make clear, *supra,* at 607–608, the change in § 1 language was not intended to modify or change the purposes or operation of the 1904 Act.[38] We agree with the Court of Appeals' conclusion, 521 F. 2d, at 104:

> "Nothing in the language of the 1907 Act or in the surrounding circumstances and legislative history indicates a change in that congressional determination to alter the reservation boundaries which we have found in the 1904 Act."

The 1907 Act, like the 1904 Act which preceded it, disestablished the land in Tripp and Lyman Counties from the Rosebud Reservation.

The pressures for more land had not yet expended themselves with the passage of the 1907 Act. In late 1908, Senator Gamble submitted a new bill authorizing the sale and disposition of a portion of the surplus and unallotted lands in Mellette County and in a strip located in the eastern part of Todd County, S. 7379, 43 Cong. Rec. 65 (1908). The accompanying Senate Report noted, in proposing the opening to settlement of an area comprising about 900,000 acres, that "[t]he *present area* of the Rosebud Indian Reservation aggregates 1,800,000 acres." S. Rep. No. 887, 60th Cong., 2d Sess., 1 (1909) (emphasis supplied).[39] The school-sections

---

[38] In one particular, the language of the 1907 Act reinforces our conclusion with respect to the 1904 Act. The 1907 Act, 34 Stat. 1230, was to open "all that portion of the Rosebud Indian Reservation in South Dakota lying south of the Big White River and east of range twenty-five west of the sixth principal meridian . . . ." This description would encompass Gregory County as well as Tripp County, unless the 1904 Act had disestablished Gregory County from the Reservation. See H. R. Rep. No. 7613, 59th Cong., 2d Sess., 1 (1907) (the bill "affects all that portion of the reservation east of range 25 of the fifth principal meridian south of the Big White River . . ."); S. Rep. No. 6838, 59th Cong., 2d Sess., 1 (1907).

[39] Mellette and Todd Counties, the two counties unaffected by the 1904 and 1907 Acts, compose approximately 1.8 million acres, whereas the

provision was again included in the bill, "to be paid for by the Government in conformity with the provisions of the act admitting the State of South Dakota into the Union." *Id.*, at 2.[40] Senator Gamble was unable to have the Senate consider the bill before the term of Congress expired, and Inspector McLaughlin was once again dispatched to conduct negotiations with the Rosebud Tribe concerning the Gamble bill.[41] This time, he did not seek to negotiate an agreement with the Indians, but reported back to the Secretary of the Interior the "practically unanimous" concurrence of the Indians "in the opening of the northern strip, provided the two

---

original (1889) Reservation encompassed somewhat over 3.2 million acres. A letter, dated January 26, 1909, from James Garfield, Secretary of the Interior, to Senator Gamble, S. Rep. No. 887, 60th Cong., 2d Sess., 3 (1909), clearly noted the perceived disestablishment of major portions of the Rosebud Reservation by the prior two Acts:

"The Rosebud Reservation has been reduced very rapidly during the last few years, and intimations have reached this department from trustworthy sources that there is danger that the land available for allotment may be exhausted if too large a reduction is made at this time. I do not believe, therefore, that the strip of land on the east of the present diminished reservation should be opened yet."

[40] See also 45 Cong. Rec. 1068 (1910) (colloquy between Sen. Gamble and Sen. Crawford):

"MR. GAMBLE. . . . [T]he Government agreed to reserve these lands and to pay for them, not only by law, but under the enabling act admitting the State of South Dakota to the Federal Union.

. . . . .

"MR. CRAWFORD. Sections 16 and 36, to which the Senator refers, are held from the settler and are given to the State to keep good the pledge made to the State by the Government under the enabling act when the State was admitted into the Union . . . ."

[41] The Secretary of the Interior believed that "the views of the Indians should be procured before the bill is finally acted on," although recognizing "the fact that Congress can enact legislation of this character without the consent of the Indians interested . . . ." Letter dated Jan. 26, 1909, from James Garfield, Secretary of the Interior, to Sen. Gamble, in S. Rep. No. 887, *supra*, at 3.

tiers of townships in the eastern part of Meyer [*sic*] County remain a part of the diminished reservation." [42]

New bills were introduced similar in purpose to the original Gamble bill.[43] The Secretary of the Interior recommended to Congress that the bill open only Mellette County, and not the eastern part of Todd County, and that the bill also include a provision subjecting the land to be opened "for a period of twenty-five years to all the laws of the United States prohibiting the introduction of intoxicants into the Indian country." [44] These changes were made in S. 183, see S. Rep. No. 68, 61st Cong., 2d Sess. (1910). The Report noted, *id.*, at 2–4:

> "The present area of the Rosebud Indian Reservation aggregates about 1,800,000 acres. The lands proposed to be opened to settlement under the provisions of this bill embrace an area of about 830,000 acres. . . .

> .        .        .        .        .

> ". . . . It also provides that the Secretary of the Interior, in his discretion, may permit Indians who have allotments within the area proposed to be opened to relinquish such allotments and to receive in lieu thereof allotments anywhere within the reservation proposed to be diminished.

> "Sections 16 and 36 of the lands in each township are not to be disposed of, but are reserved for the use of the common schools of the State, and these lands are to be paid for by the Government in conformity with the pro-

---

[42] Letter dated Apr. 29, 1909, from James McLaughlin to the Secretary of the Interior. For the negotiations with the Indians, see Transcript of Council held at Rosebud Agency, Mar. 11, 1909; Proceedings of Council held with the Indians of the Rosebud Reservation, Apr. 21 and 26, 1909.

[43] See 44 Cong. Rec. 132 (1909) (S. 183); *id.*, at 2013 (H. R. 9544); 45 Cong. Rec. 10 (1909) (H. R. 12437).

[44] Letter dated Jan. 13, 1910, from R. A. Ballinger, Secretary of the Interior, to Sen. Clapp. S. Rep. No. 68, at 5.

visions of the act admitting the State of South Dakota into the Union. . . .

      &bull;      &bull;      &bull;      &bull;      &bull;

"Although Congress has full power to enact legislation of this character without the consent of the Indians, it was felt the Indians should be fully advised as to the provisions of the pending measure and their views should be asked in regard thereto."

The bill was passed by the Senate on January 17, 1910, 45 Cong. Rec. 1065–1066, 1075 (1910), and the House Committee on Indian Affairs decided to adopt the Senate bill, its Report noting:

"The Rosebud Indian Reservation when set aside as a separate reservation under the Sioux act of 1889 contained something over 3,000,000 acres of land. [Then follows a description of the 1904 Act and the 1907 Act, observing that the 1907 Act was "substantially in the same form as the bill now under consideration . . . ."]

"The area comprised in the present bill is about 800,000 acres . . . . *There will still be left a reservation containing about 1,000,000 acres,* and as the Indians have all been allotted *there is no occasion for continuing a reservation larger than it will be when Mellette County is disposed of."* [45]

The bill then passed the House with amendments, *id.,* at 5473, and, after conference to reconcile differences in the House and Senate bills not material here, the bill became law on May 30, 1910.[46]

The 1910 Act is substantially similar to the 1907 Act, and

---

[45] H. R. Rep. No. 332, 61st Cong., 2d Sess., 2 (1910) (accompanying H. R. 12437) (emphasis supplied).

[46] Act of May 30, 1910, c. 260, 36 Stat. 448; 45 Cong. Rec. 6437 (1910) (Conference Report passes House); *id.,* at 6326 (Conference Report passes Senate).

uses identical operative language authorizing and directing the Secretary of the Interior "to sell and dispose of all that portion of the Rosebud Indian Reservation [in present day Mellette County] except such portions thereof as have been or may be hereafter allotted to Indians . . . ." 36 Stat. 448. Because of the substantive similarity of the Acts, no useful purpose would be served in recounting the similar provisions contained in the 1910 Act. Two new provisions, however, do warrant mention. The first is a proviso in § 1, stating:

> "[A]ny Indians to whom allotments have been made on the tract to be ceded may, in case they elect to do so before said lands are offered for sale, relinquish same and select allotments in lieu thereof on the diminished reservation."

This proviso, on its face, is a strong indication of the continuing intent to disestablish the affected areas, first manifested in the 1901 Agreement. The second is the provision in § 10 of the 1910 Act, included at the suggestion of the Secretary of the Interior, subjecting the opened land "for a period of twenty-five years to all the laws of the United States prohibiting the introduction of intoxicants into the Indian country." As there existed, in 1910, an outstanding prohibition against the introduction of intoxicants into "Indian country," see Act of July 23, 1892, 27 Stat. 260, the most reasonable inference from the inclusion of this provision is that Congress was aware that the opened, unallotted areas would henceforth not be "Indian country," because not in the Reservation.[47]

---

[47] See id., at 5464 (colloquy between Rep. Bartholdt and Rep. Butler):

"MR. BARTHOLDT. But if the lands are allotted it is no longer an Indian reservation.

"MR. BUTLER. If the lands are allotted, it will be no longer an Indian reservation. . . . It is where, as I understand, the Indian has

These added provisions, as well as the clear legislative history of the 1910 Act, reflect strongly the continued intent to diminish the Reservation boundaries. We conclude that

---

always lived and where he is going to live, and I believe in keeping the sale of liquor out of his neighborhood."

Under *Dick* v. *United States*, 208 U. S. 340, 359 (1908), Congress was entitled to attach liquor prohibitions, reasonable in duration, on non-Indian land which Indians were likely to frequent. Congress explicitly was adding this provision under the authority of *Dick*. See Letter dated Jan. 13, 1910, from R. A. Ballinger, Secretary of the Interior, to Rep. Burke.

The petitioner, as well as the United States, as *amicus curiae*, relies on *In re Heff*, 197 U. S. 488 (1905). As suggested by the United States, Brief for United States as *Amicus Curiae* 40 n. 28:

"Although the courts below suggested that the provision would be unnecessary if the Reservation were continued . . . , that suggestion is erroneous. As the debates show, 45 Cong. Rec. 5460–5464 (1910), members of Congress were fully aware of this Court's decision in *In re Heff*, 197 U. S. 488, holding that Indian allottees were subject to *state* liquor laws."

This reliance is misplaced. *Heff* did not deal with the question of the sale of liquor to Indian allottees on a reservation where liquor was forbidden by the Act of July 23, 1892, 27 Stat. 260. Rather, *Heff* dealt with the sale of liquor to Indian allottees under the Act of January 30, 1897, 29 Stat. 506, which prohibited the sale of liquor (without restriction on location) to Indians. *Heff*, in short, dealt with an Act which prohibited the sale of liquor, anywhere, based on the *status* of a person, while the prohibition of sales on Indian country under the 1892 Act applied to *areas*, regardless of the status of the person. (Insofar as is relevant, the 1892 Act states that no "intoxicating liquor or liquors of whatever kind shall be introduced, under any pretense, into the Indian country.") This distinction was recognized in *Dick* v. *United States*, *supra*, at 352, which, noting *In re Heff*, observed that the Indians involved in *Dick* were citizens of the United States, but then went on to discuss the "Federal liquor statute forbidding the introduction of intoxicating drinks into the Indian country." Thus, under the 1892 Act, as recognized in *Dick*, liquor was flatly prohibited from introduction into the Indian country, a prohibition which prevented sale to *all* persons. Indian country, however, did not apply to territory on which "the Indian title had been extinguished, and over which and over the inhabitants of which . . . the jurisdiction of the State . . .

the 1910 Act continued the policies of the prior two Acts, and Mellette County was thereby detached from the Reservation.

## IV

The intent of Congress in the 1904, the 1907, and the 1910 Acts was to change the boundaries of the original 1889 Rosebud Reservation. Much has changed since then, and if Congress had it to do over again it might well have chosen a different course. But, as we observed in *DeCoteau* v. *District County Court*, 420 U. S., at 449: "[O]ur task here is a narrow one. . . . [W]e cannot remake history." [48]

*Affirmed.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN and MR. JUSTICE STEWART join, dissenting.

The Court holds today that in 1904, 1907, and 1910, Congress broke solemn promises it had made to the Rosebud

---

was full and complete." *Dick* v. *United States, supra,* at 352. Land remaining within the boundaries of a reservation, of course, would not be subject to the "full and complete" jurisdiction of the State. See *Williams* v. *Lee,* 358 U. S. 217, 223 (1959). While, prior to the statutory definition in 18 U. S. C. § 1151, the defined areas of Indian country may have been a bit vague, see *Seymour* v. *Superintendent,* 368 U. S. 351, 357 (1962), *Dick* was the most recent pronouncement on the subject at the time of the 1910 Act, and clearly defined Indian country with reference to state jurisdiction. See *United States* v. *Pelican,* 232 U. S. 442, 449 (1914); *Perrin* v. *United States,* 232 U. S. 478, 482 (1914) (discussing the congressional power "to prohibit the introduction of intoxicating liquors into an Indian reservation . . ."); cf. *United States* v. *Mazurie,* 419 U. S. 544, 554–555 (1975). The liquor provision in § 10 of the 1910 Act, accordingly, is a strong indication that Congress did not view the affected areas as "Indian country," but, rather, as disestablished from the Reservation.

[48] The dissent speculates expansively on the possible adverse consequences of today's decision, *post,* at 630–633. Most, if not all, of these consequences involve issues not presented by this case. To the extent that members of the Rosebud Tribe are living on allotted land outside of the Reservation, they, too, are on "Indian country," within the definition of 18 U. S. C. § 1151, and hence subject to federal provisions and protections. Our decision in *Morton* v. *Ruiz,* 415 U. S. 199 (1974), moreover, that fed-

Sioux Tribe and took from them, without any guarantee of compensation, three-quarters of their reservation. Although it was suggested at argument, Tr. of Oral Arg. 18–20, that the only consequence of such a holding would be to preclude the Tribe from continuing to exercise the jurisdiction granted to it by its approved constitution and bylaws,[1] in fact much more is at stake. This case involves not just the rights of the Tribe, but also the rights of approximately 2,000 Indians living in the disputed area, and the right of the United States to continue to administer the disputed area as part of the Rosebud Reservation.[2] See Part IV, *infra*. In addition, the

eral benefits and programs shall be made available to tribal members living "on or near" the reservation, surely diminishes the specter of a "sharp reduction in the federal aid available to members of the Rosebud Tribe living off the reservation." *Post,* at 631. Certainly, that effect is much less clear than it would have been in *DeCoteau* v. *District County Court,* where the entire reservation was extinguished. The combined effect of 18 U. S. C. § 1151 and *Morton* v. *Ruiz, supra,* is that many of the dissent's parade of horribles are nothing more than just that.

[1] The constitution of the Rosebud Sioux Tribe, approved by the Secretary of the Interior in 1935, App. 1396–1397, states in Art. I that "[t]he jurisdiction of the Rosebud Sioux Tribe . . . shall extend to the territory within the original confines of the Rosebud Reservation boundaries as established by the act of March 2, 1889 . . . ."

There is some confusion in the record concerning the jurisdictional history of the disputed area. At the conclusion of his lengthy opinion, the District Judge stated that "the State of South Dakota has treated the [disputed] counties . . . as portions of the state over which the State of South Dakota can exercise jurisdiction since the passage of [the] acts." 375 F. Supp. 1065, 1083 (SD 1974). But contrary to the Court's suggestion, *ante,* at 604–605, n. 27, this statement is hotly disputed insofar as it implies that the Tribe has conceded jurisdiction. The Tribe claims it "has consistently exercised jurisdiction over Indians on all parts of the reservation." Reply Brief for Petitioner 2b. The United States agrees, Brief for United States as *Amicus Curiae* 32 n. 22, and has provided a number of examples, *id.,* at 23a–32a.

[2] The United States reports that it has treated the disputed areas as part of the Reservation, and that it maintains or funds child-welfare

ramifications of today's decision may extend to a large number of other reservations throughout the Nation. See *ibid.* I therefore feel constrained to explain at length why the decision is, in my view, wholly unjustifiable.

Until today, the effect on reservation boundaries of Acts disposing of surplus reservation land was well settled. The general rule, entitled to "the broadest possible scope," is that in interpreting these Acts "legal ambiguities are resolved to the benefit of the Indians." *DeCoteau* v. *District County Court,* 420 U. S. 425, 447 (1975). Congressional intent therefore must be "clear" before this Court will find that a reservation established by Congress (or the Executive) was disestablished. *Mattz* v. *Arnett,* 412 U. S. 481, 505 (1973). Applying these principles, the Court has found disestablishment when Congress ratified a treaty by which Indians agreed to sell all interest in part or all of a reservation, *DeCoteau* v. *District County Court, supra,* or when Congress employed express words of termination, *Mattz* v. *Arnett, supra,* at 504 n. 22 (dictum). But when, as here, Congress merely "opened" a reservation—that is, made reservation lands available to non-Indians and acted as a sales agent on behalf of the Indians— the reservation boundaries have been held to be unaffected. *Mattz* v. *Arnett, supra; Seymour* v. *Superintendent,* 368 U. S. 351 (1962). In *DeCoteau,* the Court clearly distinguished the two situations, observing:

"[A purchase-and-sale Act] is not a unilateral action by Congress but the ratification of a previously negotiated agreement, to which a tribal majority consented. [It] does not merely open lands to settlement; it also appropriates and vests in the tribe a sum certain . . . in payment for the express cession and relinquishment of 'all' of the

programs, burial assistance, outpatient clinics, and housing in these areas. *Id.,* at 37–38. See also Letter from the Acting Area Director, Aberdeen, S. D., Bureau of Indian Affairs, to Neil Proto, Dept. of Justice, Aug. 23, 1974, App. 1405–1409, detailing these services.

tribe's 'claim, right, title, and interest,' in the unallotted lands. The statute in *Mattz*, by contrast, benefited the tribe only indirectly, by establishing a fund dependent on uncertain future sales of its land to settlers." 420 U. S., at 448.

Today, however, the Court obliterates this distinction, and, by holding against the Tribe when the evidence concerning congressional intent is palpably ambiguous, erodes the general principles for interpreting Indian statutes.

## I

What is perhaps most striking about the Rosebud Acts, in light of the interpretation the Court places upon them, is the absence of any express provision disestablishing the Reservation. As we observed in *Mattz*: "Congress has used clear language of express termination when that result is desired." 412 U. S., at 504 n. 22. We cited three examples in *Mattz*: 15 Stat. 221, which stated that "the Smith River reservation is hereby discontinued"; 27 Stat. 63, which stated that "a portion of the Colville Indian Reservation . . . is hereby, vacated and restored to the public domain"; and 33 Stat. 218, enacted just two days before the first of the Rosebud Acts, which stated that "the reservation lines of the said Ponca and Otoe and Missouria Indian reservations . . . are hereby abolished." The very Act that created the Rosebud Reservation provides yet another example, for in that Act Congress expressly "restored to the public domain" part of the Great Sioux Reservation. Act of Mar. 2, 1889, § 21, 25 Stat. 896. And other examples abound.[3]

The Acts in question contain no similar language. The Act of April 23, 1904, 33 Stat. 254, is a peculiarly drafted statute. In substance, it is no different from the

---

[3] The National Indian Law Library's compilation of Allotment/Cession Statutes, Doc. No. 002279, contains 11 additional examples, taken from statutes enacted between 1888–1913.

statutes considered in *Mattz* and *Seymour;* it opens lands on the Reservation to white settlers, guarantees to the Indians the proceeds from the sale of the lands, but does not commit the United States to purchasing the land.[4]  In form, however, the Act "amended and modified" and then "ratified" the 1901 Agreement between Inspector McLaughlin and the Rosebud Sioux in which the Tribe agreed to sell the lands in question to the United States for a lump sum; this Agreement had been rejected by the Congress in 1902.  The "amendments" which Congress *unilaterally* inserted obviously were substantial, since they transformed the transaction from a *DeCoteau*-type purchase to a *Mattz*-type "opening."  But because the ratification format was used, the 1904 Act contains language from the 1901 Agreement which provided that the "Indians belonging on the Rosebud Reservation, South Dakota, for the consideration hereinafter named, do hereby cede, surrender, grant, and convey to the United States all their claim, right, title, and interest" in the unallotted lands in Gregory County.

In *DeCoteau* we stated that this language, when contained in an agreement approved by the Indians and ratified by Congress, is "precisely suited," 420 U. S., at 445, to terminating a reservation.  But I cannot agree with the Court, *ante,* at 597, that the language is equally well suited to disestablish the Reservation here.  Its usage may simply mean that Congress found that working from an earlier document—in this case the 1901 Agreement—was easier than drafting a new law. Whereas in *DeCoteau* the key phrase expressed the Indians' understanding of what they were surrendering and the Government's understanding of what it was acquiring, here the Indians had not agreed to this transaction and the Government disclaimed any intent to purchase anything other than school

---

[4] The United States did agree, in § 4 of the Act, to purchase sections 16 and 36 of Gregory County and to grant these sections to the State for school purposes.  The significance of this grant is discussed in n. 12, *infra.*

lands, see n. 4, *supra.* Indeed, as the Court concedes, *ante,* at 597, as a matter of English usage the words "cede, surrender, grant, and convey," make no sense in the context of an "agreement" to which the seller has not assented. Thus the Court ultimately rests its decision on an asserted ability to " 'see what [Congress is] driving at,' " even though Congress has " 'not said it.' " *Ibid.*

The 1907 and 1910 Acts are far simpler for present purposes. They contain neither words of cession nor words of termination. They simply "authorized· and directed" the Secretary of the Interior "to sell or dispose of" the specified lands "under the general provisions of the homestead and town-site laws of the United States." Act of Mar. 2, 1907, §§ 1, 2, 34 Stat. 1230; Act of May 30, 1910, §§ 1, 2, c. 260, 36 Stat. 448. These statutes are virtually identical to the law construed in *Seymour* v. *Superintendent,* which also "authorized and directed" the Secretary "to sell or dispose of" specified lands "under the provisions of the homestead laws." Act of Mar. 22, 1906, §§ 1, 3, c. 1126, 34 Stat. 80–81. They are quite similar to the Act at issue in *Mattz* which "declared" specified lands "to be subject to settlement, entry, and purchase under the laws of the United States granting homestead rights and authorizing the sale of mineral, stone, and timber lands." Act of June 17, 1892, 27 Stat. 52. They bear no resemblance, however, to the statutes cited in *Mattz* as examples of "clear language of express termination."

## II

Since congressional intent must be unambiguous before we can conclude that Congress terminated part of an Indian reservation, the absence of any express provision to this effect in the Rosebud Acts strongly militates against the interpretation the Court places on those Acts. But I need not rely on congressional silence alone—eloquent as it may be—to reject the Court's interpretation. For both the text of the

Acts and the circumstances surrounding their enactment affirmatively point to the opposite conclusion.

## A

The text of the Acts provides numerous indications that Congress did not intend to remove the opened areas from the Reservation. First, the Acts granted the Indians a variety of rights in those areas. All three Acts, for example, permitted Indians with allotments in the counties to be opened to retain their allotments,[5] and the 1907 and 1910 Acts also allowed certain Indians without allotments in these counties to secure allotments there.[6] All three Acts also granted the Indians a beneficial interest in all the opened lands, since the Acts simply made the United States "trustee for [the] Indians to dispose of said lands."[7] And the 1904 and 1910

---

[5] 1904 Act, § 1, Art. I; 1907 Act, § 1; 1910 Act, § 1.

[6] The 1907 Act provided in § 2 that before opening the lands the Secretary of the Interior "may permit Indians who have an allotment within the Rosebud Reservation to relinquish such allotment and to receive in lieu thereof an allotment anywhere within said reservation, and he shall also allot one hundred and sixty acres of land to each child . . . belonging on the Rosebud Reservation who has not heretofore received an allotment." The fact that these allotments were to be made before the county was opened to settlers indicates that they could be taken from the lands to be opened. See also H. R. Rep. No. 7613, 59th Cong., 2d Sess., 3 (1907) ("The bill further provides that . . . the Indians within the reservation may relinquish allotments and select allotments in any other portion of the reservation, *including the tract affected by this bill*"). (Emphasis added.) The 1910 Act is even clearer in this regard; it excludes from the opened county lands that "have been *or may be hereafter* allotted to Indians." (Emphasis added.)

Significantly, the 1901 Agreement which, if ratified, would have partially terminated the Reservation, did not contain any provision for new or in-lieu allotments in the tract to be ceded.

[7] 1904 Act, § 6; 1907 Act, § 8; 1910 Act, § 11. See also *United States* v. *Brindle*, 110 U. S. 688, 693 (1884). Although as the Court notes, *ante*, at 596–597, n. 18, Congress did attempt to assure that the beneficial interest eventually would be extinguished, the Acts contain no guarantee. Indeed,

Acts authorized the Executive, before opening the counties to settlers, to reserve some lands for Indian schools, religious missions, and service agencies.[8]  Of course, it is possible that Congress intended to remove the opened counties from the Reservation while leaving the Indians with a host of rights in the counties.  But this interpretation of the statutes is surely strained, especially since nothing in the legislative history indicates that such an anomalous result was desired. Thus, it is far more sensible to view these grants to the Indians as evidence that Congress did not intend to terminate the Reservation immediately.

This interpretation is supported by other provisions in the Acts as well.  In the 1907 and 1910 Acts, for example, Congress directed that payments received from sale of the lands to be opened were to be deposited "to the credit of the Indians belonging and having tribal rights on the Rosebud Reservation." [9]  If the Rosebud Acts also removed the opened counties from the Reservation, then the members of the Tribe living in Gregory County, opened in 1904, were not entitled to share in the proceeds of the 1907 or 1910 sales, and the members of the Tribe living in Tripp County, opened by the Act of 1907, were not entitled to the 1910 proceeds at the very least.[10]  Again, it is possible that Congress intended

_____

the Indians retained an interest in 4,600 acres until 1938 when these lands were restored to the Tribe.

[8] 1904 Act, § 2; 1910 Act, § 1 (second proviso).  The 1910 Act in § 1 also reserved timberland to the Indians, although there was a dispute in Congress as to whether any such land existed.  Compare 45 Cong. Rec. 5471 (1910) (remarks of Rep. Burke) with S. Rep. No. 68, 61st Cong., 2d Sess., 3 (1910).  The provision in the 1904 Act reserving these lands was not contained in the original Agreement.

[9] 1907 Act, § 5; 1910 Act, § 7.

[10] If the Rosebud Acts disestablished the Reservation, then arguably the Indians in Tripp County were not entitled to share in the 1907 proceeds either.  By the time those proceeds were deposited "to the credit of the Indians belonging and having tribal rights on the Rosebud Reservation," Tripp County had already been opened—and therefore, under the Court's

this result. But, absent contrary evidence, it is far more reasonable to assume that Congress meant for all members of the Tribe living on the original Reservation to profit from the sales, since prior to the Rosebud Acts they all had equal rights in the opened lands. Thus, the manner in which Congress defined the class of beneficiaries in the 1907 and 1910 Acts indicates that Congress believed that the Indians living in the opened counties still "belonged" to the Reservation after the lands were opened.

Finally, all the statutes contain an important guide to interpretation that the Court ignores. Each Act states, in almost identical terms, that "nothing in this 'agreement shall be construed to deprive the . . . Indians of the Rosebud Reservation, South Dakota, of any benefits to which they are entitled under existing treaties or agreements, not inconsistent with the provisions of this agreement.' " [11] These provisions constitute clear congressional commands to interpret the Rosebud Acts so as to minimize conflicts with the Treaty of 1889. Yet the Court ignores these provisions and maximizes the conflict, by construing the Acts to limit not just the Rosebud Sioux's land use, but also their jurisdiction.[12]

---

view, removed from the Reservation—by Act and Presidential Proclamation. Under this view, the Indians living in Mellette County, opened in 1910, would not have been entitled to the proceeds from the 1910 sales.

[11] 1904 Act, § 1, Art. V; 1907 Act, § 8; 1910 Act, § 11.

[12] The Court concludes that two other provisions in the Acts support its interpretation. First, it notes, *ante,* at 599–601, 608, that in all three Acts Congress agreed to purchase two sections of the opened counties for school purposes. See n. 4, *supra.* Under the enabling Act admitting the Dakotas to the United States, Act of Feb. 22, 1889, § 10, 25 Stat. 679, Congress granted these sections to the State when a reservation was to be "extinguished and such lands [are] restored to, and becom[e] a part of, the public domain." Based on ambiguous statements in the legislative history, *e. g.,* H. R. Rep. No. 443, 58th Cong., 2d Sess., 2 (1904) (the school provisions are "in conformity with . . . the enabling act"), the Court concludes that the grants in the Rosebud Acts were included " 'to implement the

B

The Court's construction of the Rosebud Acts is also untenable when the Acts are placed in ·historical context. Just as we held in *Mattz* that the statute at issue there was to be interpreted "from the overview of the earlier General Allotment Act of 1887, 24 Stat. 388," 412 U. S., at 496, so, too, must the Rosebud Acts be construed from this perspective. As we observed in *Mattz:*

"[The policy of the General Allotment Act] was to continue the reservation system and the trust status of In-

grant in the enabling act and for no other reason.'" *Ante,* at 600. But if that were true, the provisions in question would have been unnecessary, since the grant in the enabling Act was self-executing. *Minnesota* v. *Hitchcock,* 185 U. S. 373, 392–393 (1902). 'Indeed, in 1902 the House Committee on Indian Affairs had reached this conclusion with respect to the proposed bill ratifying the 1901 Agreement, and, accordingly, it had deleted the school provisions from the Senate version of the bill. H. R. Rep. No. 2099, 57th Cong., 1st Sess., 1 (1902). Since the Committee included school provisions in the subsequent Rosebud Acts, *e. g.,* H. R. Rep. No. 443, *supra,* at 2, it apparently believed that the change in the nature of the transaction meant that Congress was no longer extinguishing the Reservation and restoring the land to the public domain. Nothing in the legislative history suggests, as the Court seems to imply, *ante,* at 601 n. 24, that Congress thought it was accomplishing the former but not the latter.

Second, the Court notes, *ante,* at 613–615, that § 10 of the 1910 Act subjected the opened lands " 'to all the laws of the United States prohibiting the introduction of intoxicants into the Indian country.'" The Court reasons that if Congress believed the Reservation would remain intact this provision was unnecessary, since the Act of July 23, 1892, 27 Stat. 260, already prohibited the introduction of intoxicants into "Indian country." *Ante,* at 614 n. 47. But in 1910 the definition of "Indian country" was unsettled, and Congress may have feared that patented land *within* a reservation was nevertheless not Indian country under *Bates* v. *Clark,* 95 U. S. 204 (1877), because Indian *title* had been extinguished. Nothing in *Dick* v. *United States,* 208 U. S. 340 (1908), on which the Court relies, *ante,* at 614 n. 47, is to the contrary, as *Dick* involved ceded lands as to which the United States and the Indians had agreed federal laws would be applicable.

dian lands, but to allot tracts to individual Indians for agriculture and grazing. When all the lands had been allotted and the trust expired, the reservation could be abolished. Unallotted lands were made available to non-Indians with the purpose, in part, of promoting interaction between the races and of encouraging Indians to adopt white ways." *Ibid.* (footnote omitted).

This policy reflected Congress' attempt "to reconcile the Government's responsibility for the Indians' welfare with the desire of non-Indians to settle upon reservation lands." *DeCoteau* v. *District County Court,* 420 U. S., at 432. Because the "familiar forces," *id.,* at 431, at work on Congress demanded land for settlers, Congress opened the reservations. But because these forces were not overly concerned with the niceties of reservation boundaries, the reservation status of the opened areas was preserved until the trust period expired, to insure federal protection of the Indians while they were being "civilized" through contacts with white settlers. Thus, to interpret the Rosebud Acts as terminating three-fourths of the Rosebud Reservation is to set them at war with Congress' general policy toward Indians at the time the Acts were approved.

## III

The Court ultimately rests its construction of the Acts on an analysis of their legislative history. While there may be occasional passages in the history that suggest an intent to terminate,[13] I cannot agree that such an intent is established with anything approaching the requisite clarity.

---

[13] The statements that most clearly suggest an intent to terminate are fully intelligible only to those with a knowledge of the geography of the Reservation. For example, in the House Committee Report on the 1904 Act, the Committee stated:

"There is no question but what the Indians have no use for the land that is proposed to be ceded by this bill; that the tract is only a very small portion of the Rosebud Reservation, and is really only a corner of

In the first place, the legislative history of the Rosebud Acts is extraordinarily sparse. The 1904 Act, which the Court properly regards as the crucial Act, was introduced by Representative Burke of South Dakota on January 19, 1904, 38 Cong. Rec. 902–903; was reported out of the Committee on Indian Affairs, which Mr. Burke chaired, two days later, *id.*, at 1010; and passed the House on February 1, *id.*, at 1469, after a debate that consumes only six pages in the Congressional Record, *id.*, at 1423–1429.[14] The bill was transmitted to the Senate the same day; was reported out of the Committee chaired by Senator Gamble of South Dakota three days later; *id.*, at 1601; and was called up, amended, and approved by the Senate without debate on April 18, *id.*, at 4988.[15] The House concurred in the Senate amendments the following day without any discussion. *Id.*, at 5155. The 1907 Act received

the Reservation, which will be left compact and in a square tract . . . ." H. R. Rep. No. 443, *supra*, at 3.

By consulting a map one discovers that without Gregory County—the tract in question—the Rosebud Reservation would be "compact" and "square." See also 41 Cong. Rec. 3104 (1907) (remarks of Rep. Burke: "They will have left, after this land is disposed of, a reservation that is substantially 50 miles square"); S. Rep. No. 68, 61st Cong., 2d Sess., 2 (1910) ("The present area of the Rosebud Indian Reservation aggregates about 1,800,000 acres"); H. R. Rep. No. 332, 61st Cong., 2d Sess., 2 (1910) ("There will still be left a reservation containing about 1,000,000 acres, and . . . there is no occasion for continuing a reservation larger than it will be when Mellette County is disposed of").

[14] In the preceding session of Congress, Representative Burke had introduced an identical bill, 36 Cong. Rec. 2409 (1903), which was approved by his Committee two days later, *id.*, at 2473, but never reached the House floor.

[15] Senator Gamble had introduced a similar bill the preceding year, *id.*, at 2434, had obtained Committee approval in two days, *id.*, at 2498; and Senate approval, without debate six days later, *id.*, at 2747–2748. He reintroduced the bill on January 25, 1904, 38 Cong. Rec. 1100, but the House bill was approved before the Senate could act on Senator Gamble's bill. See *id.*, at 1877.

even less congressional attention. It was approved within one month after it was introduced without any debate in the Senate, 41 Cong. Rec. 3323 (1907), and with a debate in the House that occupies only one page in the Record, *id.*, at 3104.[16] Only the 1910 Act was seriously debated by Congress, and these debates focused almost exclusively on the method by which the opened lands would be distributed to white settlers. 45 Cong. Rec. 1066–1071, 5456–5473 (1910).

In light of the brevity of the debates, it is not surprising that there is a paucity of relevant materials. The Court finds just two quotations from the debates, *ante,* at 596, 608, and three quotations from the Committee Reports, *ante,* at 595, 611, 612, that directly bear on the disestablishment issue.[17] What the Court cannot find, however, is particularly telling. Unlike the debates in *Mattz* which revealed that "the establishment of the reservation . . . was viewed as a mistake and an injustice," 412 U. S., at 500, there were no expressions of hostility toward the existence or size of the Rosebud Reservation. Nor were there any statements indicating that Congress intended to deviate from its general policy of preserving reservations or to abandon its role as guardian of the Indians living in the opened counties. Indeed, although Congress was

---

[16] Representative Burke and Senator Gamble each had introduced similar bills in December 1906, 41 Cong. Rec. 15, 50–51. After an agreement was reached between the Tribe and Inspector McLaughlin on January 21, 1907, Representative Burke introduced a new bill, *id.*, at 1782. On February 14, 1907, the Office of Indian Affairs recommended that the agreement be approved (even though the Indians had not assented), and the bill was reported out of the House Committee that same day, *id.*, at 3004. Two days later it passed the House. *Id.*, at 3105.

On February 18, the Senate Committee sent to the Senate a substitute version of the 1906 Gamble bill. *Id.*, at 3207. By that time, however, the House had already approved the second Burke bill, and the Senate amended and approved that bill on February 19, *id.*, at 3323.

[17] The Court also quotes some discussions bearing on the school lands and liquor law provisions. See n. 12, *supra.*

aware that the Rosebud Acts initiated a new policy toward surplus lands [18]—one which removed the Government from the role of buyer and the Indians from the role of seller—at no point in the debates did anyone discuss the consequences of this change on Reservation boundaries.

The poverty of the Court's analysis is best revealed by its treatment of the history of the crucial 1904 Act. The Court begins with "the undisputed fact that the 1901 Agreement, had it been ratified by Congress, would have disestablished that portion of the Rosebud Reservation which lay in Gregory County." *Ante,* at 591. Its review of the legislative history then leads it to conclude that "there is no indication that Congress intended to change anything other than the form of, and responsibility for, payment." *Ante,* at 594–595. But the fact that Congress did not expressly repudiate all of the consequences of an Agreement to which it was not a party and which it had refused to ratify hardly establishes that Congress affirmatively intended those consequences to result from the very different transaction it devised in 1904.[19] It is at least

[18] See, *e. g.,* H. R. Rep. No. 443, 58th Cong., 2d Sess., 2 (1904) ("[T]hese bills present a new idea . . . and . . . will establish a new policy and be a departure from the policy that has long since prevailed").

[19] Although the Court states that the " 'problem in the Congress [with respect to the 1901 Agreement] was not jurisdiction, title, or boundaries. It was, simply put, money,' " *ante,* at 591 n. 10, the historical evidence is not nearly so clear. In the Senate, the concern with the 1901 Agreement was not with the fact that the United States was expending money to acquire the lands, but with its failure to obtain reimbursement from settlers. After much debate, however, the Senate ultimately rejected an amendment that would have required settlers to purchase the opened lands from the United States, 35 Cong. Rec. 4971 (1902), and approved the agreement, *id.,* at 5024. The House, on the other hand, never even debated the ratification bill, and thus we have no firsthand knowledge of the basis for the opposition in that body. All of the statements that the Court relies on were made by *proponents* of the 1901 Agreement in connection with the 1903 and 1904 bills. *Ante,* at 591, and n. 10. Moreover, the fact that the House apparently was unwilling to authorize the United

equally plausible that Congress did not explain the effect of the 1904 Act because it assumed that the Act would have precisely the same effect as earlier nonpurchase surplus land Acts such as those considered in *Mattz:* The lands would be opened and the reservations preserved. Nor is the fact that Congress adopted the format of the 1901 Agreement especially probative, since this may have been done simply out of convenience.

Ultimately, what the legislative history demonstrates, as co-counsel for the State has aptly concluded, is that Congress manifested an "almost complete lack of . . . concern with the boundary issue." [20] The issue was of no great importance in the early 1900's as it was commonly assumed that all reservations would be abolished when the trust period on allotted lands expired. There was no pressure on Congress to accelerate this timetable, so long as settlers could acquire unused land. Accordingly, Congress simply did not focus on the boundary question. Its indifference is perhaps best manifested by the fact that in legislation concerning the Reservation enacted immediately subsequent to the Rosebud Acts, Congress at times referred to the opened counties as part of the Reservation, and at times referred to them as no longer part of the Reservation.[21] For the Court to find in this con-

---

States to purchase the lands and recoup the costs from the settlers suggests that money was not the sole concern.

[20] Comment, New Town et al.: The Future of an Illusion, 18 S. D. L. Rev. 85, 117 (1973).

[21] For example, in 1909 Congress appropriated funds for a mission "[o]n the Rosebud Reservation," and included within this category a mission in Gregory County. 35 Stat. 809. On the other hand, a 1905 Act extending the time for settling in Gregory County referred to the lands as "heretofore a part of the Rosebud Indian Reservation." C. 545, 33 Stat. 700. The modern statutes appear to be more consistent in labeling the opened counties as part of the Reservation. See 77 Stat. 349 (1963); 78 Stat. 560 (1964); 89 Stat. 577 (1975).

The subsequent treatment of the disputed counties by the Interior

fusion and indifference a "clear" congressional intent to disestablish the Reservation is incomprehensible.

## IV

The most obvious and immediate consequence of today's decision is jurisdictional. Even though the people of South Dakota have expressly declined to assume jurisdiction over Indian country,[22] from now on crimes (or torts) committed by the Indians on nontrust land in the opened counties will be within the jurisdiction of the State. This will create an "impractical pattern of checkerboard jurisdiction," in which "law enforcement officers . . . will find it necessary to search tract books in order to determine whether criminal jurisdiction over each particular offense . . . is in the State or Federal Government." *Seymour* v. *Superintendent,* 368 U. S., at 358. In addition, even while on their trust lands, the almost 2,000 enrolled Indians in the opened counties will be generally subject to "state law otherwise applicable to all citizens of the State," *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145, 149 (1973), even if the same law could not be applied to Reservation Indians because it would "interfere with reservation self-government or would impair a right granted or reserved

Department reflects a similar confusion as to the status of the counties. Each side has presented to this Court a number of instances in which the counties were referred to by Department personnel in terms favorable to their case. Compare Brief for United States as *Amicus Curiae* 33–38, 33a–41a, with Brief for Respondents 106–120. In the two instances in which Department officials have addressed the question directly, however, they have concluded that the opened counties are part of the Reservation. 54 I. D. 559 (1934) (opinion of Commissioner of Indian Affairs on Restoration of Lands Formerly Indian to Tribal Ownership); App. 1398–1404 (memorandum of Field Solicitor, Aberdeen, S. D., Apr. 6, 1972).

[22] At oral argument we were informed that in 1962 the people of South Dakota rejected by a referendum an Act of the legislature that would have granted the State jurisdiction over Indian country pursuant to §§ 6, 7, 67 Stat. 590 (1953). Tr. of Oral Arg. 10.

by federal law," *id.*, at 148. This is reason enough to be troubled by today's decision.

But beyond these jurisdictional consequences, the holding today places a grave cloud over the property rights of both the Tribe and the Indians living off the newly contracted Reservation. With respect to the Tribe, 4,600 acres in the opened counties were returned to it pursuant to the Indian Reorgani-- zation Act of 1934, 48 Stat. 984, after the Secretary found, in the words of § 3 of the Act, that these were "the remaining surplus lands of [an] Indian reservation" opened before June 18, 1934. But if the opened counties were not part of the Reservation, then the Secretary's right to return the land to the Tribe is at least open to question.[23] More seriously, the Indians living on trust lands in the opened counties have assumed that § 2 of the Reorganization Act, which extended the trust period on "Indian lands," applied to their property. But if these counties were not part of a reservation, this assumption is dubious at best, since § 8 of the Act states that the Act shall not "be construed to relate to Indian holdings of allotments . . . upon the public domain outside of the geographic boundaries of any Indian reservation now existing . . . ." Should it be determined that the trust period was not extended, the State of South Dakota could claim crushing amounts of back taxes.

Finally, today's decision may result in a sharp reduction in the federal aid available to members of the Rosebud Tribe living off the Reservation. The Bureau of Indian Affairs has been administering the opened counties as part of the Reservation, see n. 2, *supra*, and in requesting appropriations for the Reservation Indians has included Indians living in the

---

[23] Arguably the Secretary acted properly so long as the lands were part of the Reservation at the time they were opened. See 56 I. D. 330 (1938). This was not the theory on which the Secretary proceeded, however, in ordering restoration. 54 I. D. 559 (1934).

opened counties, Brief for United States as *Amicus Curiae*
37–38. In addition, we have been advised by the Association
on American Indian Affairs et al., as *amici curiae,* that
the Rosebud Tribe has received a large amount of federal aid
pursuant to a variety of federal programs. Brief 31–39.
The Association reports that in the past the Tribe has been
able to expend these monies for programs in the opened as
well as the closed counties, because the federal agencies have
viewed all the counties as part of the Reservation. *Ibid.* But
in light of today's decision, the Tribe's ability to use federal
funds to benefit tribal members living in these counties is in
serious doubt.[24]

Nor are these potential consequences limited to the Rose-
bud Reservation. The Rosebud Acts were described by their
sponsors as the beginning of a new policy with respect to
surplus lands. See n. 18, *supra.* During the decade follow-
ing the enactment of the first Rosebud Act, Congress passed
21 other statutes that opened surplus reservation lands to
settlers.[25] If the Rosebud Acts diminished the Rosebud Res-

---

[24] For example, according to the United States, the Department of
Housing and Urban Development, which has been making grants to the
Tribe, will no longer be able to approve projects in the opened counties,
since with respect to those counties the Tribe will no longer be a "govern-
mental entity" or "public body" under 42 U. S. C. § 1460 (h). Brief for
United States *as Amicus Curiae* 38. The Department of Agriculture has
already ruled, in light of the Court of Appeals decision, that money made
available to the Tribe to acquire lands pursuant to 25 U. S. C. § 488,
cannot be used in the opened counties. Brief for Association on American
Indian Affairs et al. as *Amici Curiae* 36.

Of course, in holding that the opened counties are outside the Reserva-
tion, the Court does not necessarily preclude the Government or the
Tribe from providing any aid to Indians in those counties. Cf. *Morton
v. Ruiz,* 415 U. S. 199 (1974).

[25] National Indian Law Library, Allotment/Cession Statutes, Doc. No.
002279. Of these statutes, five were passed with the consent of the affected
Indians; these five were enacted within a year after the first Rosebud Act.

In addition to the 21 post-Rosebud Act statutes, there are at least five

ervation, then the boundaries of more than a score of other reservations must be in doubt.

Because I can find no principled justification for inflicting manifold injuries on the Rosebud Sioux Indians and for jeopardizing the rights of numerous other tribes, I respectfully dissent.

---

pre-Rosebud Act laws which also opened surplus reservation land to settlers without Indian consent. There are also at least 15 pre-Rosebud Act laws which opened surplus land with consent.